UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PHYLLIS H. MCGUIRE and
OSCAR MCGUIRE

        Plaintiffs,                  Civil Action No.
                                  08-CV-12715

vs.

                                  PAUL D. BORMAN
ZVONIMIR MATIJEVIC and          UNITED STATES DISTRICT JUDGE
AFTIM 2000, LTD.,

        Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This is a negligence case arising out of an automobile accident. Plaintiffs are Phyllis McGuire ("McGuire") and her husband, Oscar McGuire ("Oscar"). Defendants are Zvonimir Matijevic ("Matijevic") and his employer, AFTIM 2000, Ltd. ("AFTIM") (collectively, "Defendants"). On June 1, 2007, McGuire's Chevy Blazer was sideswiped by a truck driven by Matijevic, in the course of his employment with AFTIM, as the two were making simultaneous left-hand turns in adjacent left-hand turn lanes.

Now before the Court is Defendants' Motion for Summary Judgment [docket entry 36]. The sole issue currently before the Court is whether, taking the evidence in the light most favorable to McGuire, the non-moving party, there is a genuine issue of material fact as to whether McGuire suffered a "serious impairment of a body function" under Mich. Comp. Laws § 500.3135(1). This matter has been fully briefed and the Court heard oral argument on March 31, 2010.

1

Prior to oral argument, on March 18, 2010, Defendants filed a motion in which they requested permission to file with the Court as evidence, previously-requested, but newly-acquired medical records from the Henry Ford Health System (HFHS) regarding McGuire's pre-collision medical history. *See* docket entry 40. On March 31, 2010, the Court heard oral argument on Defendants' Motion for Summary Judgment. Two days after oral argument, after the expiration of the 14 day period in which McGuire could respond to Defendants' March 18, 2010, motion to admit the newly-acquired medical records, the Court issued a formal order admitting the newly-acquired evidence. *See* docket entry 41. In the order, the Court noted that McGuire had not objected to their admission, either during oral argument or by written brief. *See id.*

Because the Court determined that the newly-admitted medical documents were relevant to the instant decision, the Court provided the parties with an opportunity to file supplemental briefs discussing the impact of the new evidence on Defendants' Motion for Summary Judgment. The Court now has received the parties' supplemental briefs. *See* docket entries 43-45.

The Court has carefully considered the entire record in this case, including the pleadings, the parties' original briefs, the evidence attached thereto, the newly-admitted evidence, and the parties' supplemental briefs. For the reasons that follow, the Court will deny Defendants' Motion for Summary Judgment.

## II. BACKGROUND[1]

### A.

On June 1, 2007, Plaintiff McGuire was driving her Chevy Blazer and was stopped at a red light at the end of an I-94 exit ramp in Romulus, Michigan, waiting to turn left onto Middlebelt

---

[1] The background is gleaned from the evidence attached to the parties' papers.

Road. McGuire's daughter was also in the car, sitting in the passenger seat. McGuire Dep. at 23-24. The two were on their way to pick up a rental car. *Id*. at 14.

Matijevic, who was driving a truck in the course of his employment with AFTIM, was also stopped at the red light, waiting to turn left in a second, parallel left turn lane next to McGuire. McGuire Dep. at 18. When the light turned green, the two began making their respective left-hand turns when the trailer of Matijevic's truck crossed-over into McGuire's lane and sideswiped the passenger side of McGuire's Blazer. *Id.* Photos of the damage to McGuire's Blazer are attached as Exhibit D to Defendants' motion.

McGuire, who was wearing her seatbelt, testified that both vehicles were "going slow" at the time of the collision, "[n]o more than five, ten miles per hour." McGuire Dep. at 18, 23, 35-36. The air bags in McGuire's Blazer did not deploy. *Id*. at 35-36.

McGuire testified that she felt "dazed" after the collision but did not hit her head or sustain a head injury. *Id*. at 34-35. When asked immediately following the accident if she was okay, McGuire responded "yes." *Id*. at 28. When asked at her deposition if any part of her body impacted her vehicle, McGuire stated: "[m]y chest hit the steering wheel; the seat, with the shoulder." *Id*. at 35.

After the collision, McGuire and Matijevic pulled-over until the police came. *Id*. at 29. When the police left, McGuire and her daughter proceeded to the rental car office:

> Q:     After the police left, then what did you do?
>
> A:     Well, my – I was in the car and I waited until the traffic cleared and then I proceeded to go to the rental car.

*Id*. at 31. When McGuire and her daughter arrived at the rental car office to find that the car they wanted to rent was not available, *id*. at 32, they proceeded to a second rental car office and rented

a car. *Id*. at 32-33. McGuire then drove home and called her insurance company to report the collision. *Id*. Later that same day, McGuire went shopping with her daughter at Fairlane Mall. *Id*. at 38.

## B.

McGuire did not seek medical treatment for any injuries on the day of the accident. She first sought treatment on June 6, 2007, five days after the accident.

McGuire claims four injuries arising out of the collision: right knee, lower back, left shoulder, and head. *Id*. at 36-37.[2] The record reflects that McGuire was seen by numerous doctors

---

[2] McGuire contends in her various briefs that the collision caused the onset of carpal tunnel syndrome. However, at her deposition, she was not sure of this claim:

> Q:    Other than your right knee, your low back and your left shoulder, did you have any other injuries as a result of this accident for which you have sought medical treatment?
>
> A:    For my head.
>
> Q:    Your right knee, your left shoulder, your low back and the problems with your memory, those are the four medical problems that you attribute to the accident; is that correct?
>
> A:    Yes.
>
> Q:    Okay. And do you attribute any other medical problems that you have since the accident – well, have you had any other medical problems since the accident?
>
> A:    Yes.
>
> Q:    What other medical problems have you had?
>
> A:    On the 7th of April [2009], I did an EMG and they said that I had carpal tunnel.

in the latter half of 2007, in 2008, and in 2009. Medical documents relating to McGuire's office visits are attached as Exhibit F to Defendants' motion and as Exhibits 3-11 to McGuire's response. McGuire's knee, back, shoulder, and head injuries are discussed in some detail below.

McGuire testified that she first noticed knee pain while shopping at Fairlane Mall several hours after the accident. *Id*. at 39. McGuire described the pain in her knee as "throbbing" and classified it at a level five on a one through ten pain scale, ten being the most pain she has ever felt in her life. *Id*. McGuire testified that her knee pain got progressively worse over the next few days, until she sought treatment from her physician, Dr. Nilofar Khan, on June 6, 2007.

On June 6, 2007, Dr. Khan took an x-ray of McGuire's knee, which was unremarkable. *Id*. at 41-42; Def. Ex F., p. 9. Dr. Khan's examination notes stated "mild puffiness of the right knee" and "[s]ome limitation of movement to full flexation because of discomfort." Def. Ex F., p. 6. Dr. Khan diagnosed a "right knee strain." *Id*. McGuire was advised to take Tylenol Arthritis. *Id*.; McGuire Dep. at 42.

McGuire testified that lower back pain began around the same time as her knee pain, several hours after the accident. McGuire Dep. at 42. McGuire described the pain in her lower back as a "crampy pain" and classified it at a five on the aforementioned pain scale. *Id*. at 43. Dr. Khan examined McGuire and diagnosed a "lower back sprain." Def. Ex F., p. 6. An x-ray of McGuire's spine taken on the same day revealed "mild scoliosis and degenerative changes in the lumbar spine."

---

Q:    But you don't attribute that to the accident, I suspect, or do you?

A:    I don't know. I don't –

McGuire Dep. at 37, 73-74. McGuire testified that her arm did not start bothering her until November 2008, well over a year after the collision. McGuire never complained of wrist or arm pain when she was treated on June 6 and 25, 2007, for injuries arising from the collision.

*Id.* at p. 8.

McGuire followed-up with Dr. Khan on June 25, 2007. On this date, McGuire first sought treatment for her shoulder injury. *Id.* at p. 10. McGuire described the pain in her shoulder as a "shooting pain" that "comes and goes" with certain movements like twisting, lifting, and turning. McGuire Dep. at 47. McGuire classified the pain at a six or seven on the pain scale. *Id.*

During the June 25, 2007, office visit, Dr. Khan examined McGuire's shoulder and concluded:

> Examination of left shoulder, there is no tenderness at insertion of the bicipital tendon. Passive abduction of the shoulder joint is normal. Full range of movement. Motor power equal and good. Reflexes equal. Neurovascular: Intact.

Def. Ex. F, p. 10. Dr. Khan diagnosed a "left shoulder sprain." *Id.* An x-ray of McGuire's shoulder was also taken on this date, which revealed "extensive osteophytosis of the acromion and acromioclavicular joint." *Id.* at p. 12.

Dr. Khan prescribed physical therapy for McGuire's back and knee on June 25, 2007. *Id.* at p. 11. McGuire had not yet gone to physical therapy as of August 28, 2007, the day on which McGuire was next seen by Dr. Khan. Dr. Khan's examination notes from August 28, 2007, state

> Mrs. Phyllis McGuire was seen by me in June. She had been in a motor vehicle accident on June 1st and she had a complaint of pain in her right knee, right ankle, and lower back. She had also been having some problems with her left shoulder. She was given physical therapy, but she could not go because she was busy taking her daughter to college; and now when she called, she was told her request had expired. She needs another one.

*Id.* at p. 13.

McGuire testified that since the time of the accident, the pain in her lower back has gotten

progressively worse and, at the time of her deposition on April 17, 2009, the pain was a seven or eight on the pain scale. McGuire Dep. at 45. The pain is only eased, according to McGuire, when she sits or lays down. *Id*. at 44.

Several months after the accident, on October 12, 2007, McGuire was treated by Dr. Ramsey Shehab for her knee problems. Dr. Shebah ordered an MRI, which revealed a "small tear" in her knee and osteoporosis. McGuire Dep. at 55. Dr. Shehab's examination of McGuire's right knee revealed "mild swelling" and "evidence of trace effusion." McGuire Ex. 8, p. 1. Dr. Shehab presented McGuire with three options: continue the physical therapy, shots, and surgery. McGuire Dep. at 55. McGuire elected to continue with the physical therapy but, when the physical therapy did not resolve her problems, eventually opted to have the shots, which did not help. *Id*. at 55-56.

On November 14, 2007, Dr. Shehab filled out an insurance form in which he wrote that McGuire should "avoid[] kneeling, bending, squatting-type activities." McGuire Ex. 13. Dr. Shehab also noted in the same form that McGuire's recovery prognosis was "good." *Id*.

McGuire was seen by Dr. Shehab again on January 10, 2008, and January 27, 2009. McGuire Ex. 8. On the latter date, Dr. Shehab reported that McGuire "is better" and that an examination of her right knee revealed "no significant swelling" and "no effusion." *Id*.

On July 21, 2008, McGuire was seen by Dr. Henry Kroll with regard to her back problems. Dr. Kroll ordered a CAT scan of McGuire's lumbar spine, which showed "multilevel facet arthropathy and multilevel disk-space narrowing with diffuse broad-based disk-bulging." McGuire Ex. 9, p. 11. An MRI of McGuire's cervical spine showed "mild disk bulging and degenerative changes at C4-C5, C3-C4." *Id*. Dr. Kroll diagnosed "lumbar rediculopathy," "lumbar and cervical facet arthropathy," and "cervical rediculopathy," and recommended lumbar epidural steroid

injections.  *Id*.

McGuire was also treated by Dr. Brian Rill, an orthopedic surgeon, for her shoulder problems.  *Id*. at 57.  On March 26, 2008, Dr. Rill noted that McGuire has "developed insidious onset of neck and shoulder pain" and diagnosed "bilateral shoulder dyskinesis, left worse than right" and "left shoulder partial-thickness rotator cuff tear."  McGuire Ex. 5, p. 1-2.  McGuire was treated extensively by Dr. Rill through the remainder of 2008 and up until mid-2009.  Dr. Rill's examination notes are attached as Exhibit 5 to McGuire's response brief.  The final examination note by Dr. Rill, dated May 6, 2009, states McGuire indicated a desire to undergo "elective carpel tunnel surgery" and "arthroscopic intervention" (i.e., surgery on her shoulder).  McGuire states in her brief that both of these surgeries have taken place.

### C.

Several months after the accident, McGuire went to a neurologist because she was "hav[ing] trouble with [her] speech and remembering things."  McGuire Dep. at 37. The trouble began in November or December of 2007, about five or six months after the accident.  *Id*.

McGuire treated with Dr. Mirela Cerghet, a neurologist, on February 25, 2008.  McGuire Ex. 6.  Dr. Cerghet reported that McGuire's neurological examination was "unremarkable."  *Id*.  Dr. Cerghet referred McGuire to a psychiatrist, Dr. Lanzisera, for depression.  McGuire Dep. at 62-63.

### D.

On December 8, 2009, McGuire was evaluated by Defendants' expert, Dr. Scott Monson, an orthopaedic surgeon.  Def. Ex. I.  His written report states, in relevant part:

> Ms. McGuire was in an accident and required no hospitalization and there were no fractures, dislocations, or long-term injuries noted.  She does have degenerative changes on all studies that I have reviewed.  Simply put the history suggests no evidence of long-term injury and at this time her current

diagnosis is osteoarthritis of the knees, the shoulders, and the back and neck, complicated by her obesity. I would strongly recommend dietary consultation with weight loss. Home exercise would be essential.

The patient was found, as I understand it, to have a partial thickness rotator cuff tear on the left shoulder when they did the scope. That is likely related to the tendonosis. At any rate, I would allow full activities but home exercise is essential and she should follow with an orthopedic surgeon as needed. X-rays did reveal extensive spondylosis at L5-S1 with scoliosis, and of course degenerative tears in the knee associated with advanced degenerative changes on the MRI of that right knee.

Based on the history, clinical examination and review of medical records, there is no evidence of any orthopaedic disability or impairment involving the neck, back, shoulders or knees which resulted from the motor vehicle accident of June 1, 2007. She does not require any formal treatment as a result of the accident, and I would allow her to perform her normal daily activities and work duties as she did prior of the accident.

*Id.*

### E.

McGuire testified that before the accident, her hobbies were bowling, reading, sewing, and dancing. *Id*. at 66, 76. McGuire testified that she had bowled about once per month before the accident and has not tried to bowl since the accident. *Id*. at 66.

McGuire further testified that the accident has not impacted McGuire's ability to read, *id*., but has effected her ability to sew. Before the accident, McGuire sewed about one time each month or every other month. *Id*. at 67. According to McGuire, she has not been able to sew since the accident because she is "not able to lay the pattern out, cut it out" and "[b]ending over the sewing machine gives [her] pain." *Id*. Additionally, McGuire testified that she has been unable to go dancing since the accident. *Id*. at 76-77.

McGuire also testified that she "can't do housework anymore." *Id*. at 69. Specifically, she stated that she cannot cook, clean, mop, wash walls, do the laundry, iron, vacuum, take out the

trash, or clean the bathtub.  *Id*. at 69-70, 77-78.

Since the accident, McGuire has also been unable to play with her grandchild in the same way as she did before the accident due to back pain, pain in her right hand and arm, and right shoulder.  *Id*. at 79.  As stated by McGuire, "I can't play with him like I used to.  I could pick him up and play with him, take him to the playground, play baseball, play catch, so I'm not really able to do that now."  *Id*. at 75.

McGuire testified that, since the accident, she has missed out-of-state family reunions.  *Id*. at 76.  McGuire was able to drive her daughter to college in Alabama with her husband in August 2008.  *Id*. at 83.  According to McGuire, they "had to stop a lot."  *Id*.

In January 2006, about a year and a half before the collision, McGuire reported to her doctor that "[s]he is not Very Active during leisure time" and that she does not participate in leisure time activities.  Def. Ex. R.

## F.

Plaintiffs' brief in response to Defendants' Motion for Summary Judgment states:

- "It is important to note at the outset that, prior to the June 1, 2007 collision, Ms. McGuire had no preexisting neck, shoulder, or knee injuries."  Resp. at 2.

- "Ms. McGuire's pre-collision medical records are devoid of any cognitive impairments, neck, back, left shoulder, or right knee conditions."  Resp. at 18.

Plaintiff Phyllis McGuire's deposition testimony was:

> Q:     Do you recall ever having had any injuries to your right knee prior to the accident?
>
> A:     No.

McGuire Dep. at 73.  Co-Plaintiff Oscar McGuire testified:

> Q:     Are you aware of any preexisting conditions that your wife was

10

suffering before or at the time of the collision?

A:     No.

Q:     Okay.  Are you aware of any problems that she was having with . . .
       her shoulders, her back or her knee or her mind that were made worse
       by the accident?

A:     No.

Oscar Dep. at 12-13.

In addition, during discovery, Defendants requested that Mrs. McGuire produce "[a]ll medical records generated prior to the subject accident which relate to any area of [her] injuries as alleged in the Complaint."  Request for Production No. 5, Def. Ex. G.  McGuire responded: "None that I am aware of or recall."  *Id.*

## G.

The recently-admitted exhibits of McGuire's pre-accident medical records, Exhibits O, P, Q, and R, reflect an extensive medical history, most of which McGuire flat out denied in her deposition testimony.  The following is a summary, in chronological order, of pertinent portions of the newly-admitted medical reports evidencing McGuire's pre-collision medical history:

•     On October 29, 1992, McGuire complained of "right lower extremity pain" "with uncomfortable pulling sensation in the lateral aspect of the right lower leg."  Def. Ex. O, part 1, p. 1 (Report of Dr. T. Gordon)

•     In May 1992, McGuire fell, fracturing her right fifth finger.  Def. Ex. P, p. 2 (Report of Dr. Alpern).

•     In June 1992, McGuire had surgery in which a foreign body was excised from the dorsum of her left hand.  Def. Ex. P, pp. 6-7 (Report of Dr. K. Foley), Def. Ex. P, pp. 11-12 (Report of Dr. Ditmars).

•     In September 1995, McGuire fell from a step ladder, injuring her right knee, elbow, and back.  According to medical records, McGuire's right knee pain was worse than her elbow pain.  A doctor visit on September 28, 1995, revealed that McGuire's right knee was "warm with an effusion present."  McGuire was diagnosed with a "right knee strain

with possible medial meniscal tear" and "back strain status post fall." Moreover, an MRI taken of McGuire's right knee on December 11, 1995, reflected (1) an "increased amount of fluid within the knee joint with distension of the medial and lateral patellar recess and the suprapatellar pouch," (2) a "partial tear of the superficial, femoral portion of the medical collateral ligaments," (3) moderate sized synovial effusion; slight synovitis," (4) "red marrow reconversion," (5) "horizontal oblique tear of the posterior horn of the medical meniscus. Slight protrusion of the body of the medial miniscus." On December 21, 1995, McGuire was diagnosed with a "contusion/sprain of the right knee with tear of the medial collateral ligament and posterior horn of the medial meniscus." She underwent physical therapy for her right knee injury, along with back strengthening. Notably, doctor notes state that McGuire complained of pain in her right knee "mostly with activity." Def. Ex. O, part 1, pp. 3-7 (Report of Drs. M. McKinley, L. Bodzin).

- In November 1995, McGuire complained of "a knot on the back of her left ankle, which has been present . . . ever since falling off a two step stool at her home while wall papering." According to the medical report, "she landed on her right knee" when she fell off the step ladder two months earlier. McGuire was diagnosed with "a very mild partial achilles tendon rupture with scarring." Def. Ex. O, part 1, p. 14 (Report of Dr. M. Kahn).

- Also in November 1995, McGuire reported to her physician that the pain in her right knee "tends to radiate slightly from the knee down to the anterior mid shin area." An examination of her right leg and knee "reveals a considerable effusion of the right knee" with "tenderness along the medial joint line and the course of the petellar tendon." Def. Ex. O, part 1, p. 15 (Report of Dr. L. Bodzin).

- Medical documents reveal that McGuire's pain continued into 1996. A physical/occupational therapy report dated January 4, 1996, notes "slight antalgic gait" as a result of her right knee pain. Def. Ex. O, part 1, p. 20 (Report of Drs. M. McKinley, L. Bodzin); Def. Ex. O, part 2, pp. 1-2 (Report of Drs. M. McKinley, L. Bodzin).

- By February 1996, McGuire reported that her right knee and ankle felt "95% better." The doctor noted that the swelling in her right knee had decreased. Def. Ex. O, part 2, p. 7 (Report of Drs. M. McKinley, L. Bodzin).

- In June 1998, McGuire suffered "painful right lower leg secondary to probably muscle pull." According to the medical documentation, McGuire was in a store when she "almost tripped" over a grocery cart. "She states that she strained the right lower leg trying not to strike the baby and since that time has had persistent pain in the right lower leg." Def. Ex. O, part 2, pp. 8-9 (Report of P. Collier, Certified Nurse Practitioner).

- According to medical notes dated October 21, 1999, McGuire fell while rollerskating

12

in February 1999 and broke her right ankle, requiring surgery. At that time, McGuire complained of pain while sitting, walking, climbing stairs, and standing. She also complained of difficulty sleeping, and stated that the pain is made better when she is off her feet and relaxing. Def. Ex. O, part 2, p. 18 (Report of J. Gibson, Physical Therapy).

• In April 1999, McGuire complained of "burning pain" in her right ankle and was diagnosed with an ankle fracture and "widening of the medial joint space." Def. Ex. O, part 2, pp. 10-12 (Report of Dr. B. Craig).

• In a medical document dated November 5, 1999, McGuire's doctor noted a medical history of "broken bones, right lower leg; high blood pressure; right knee injury, she had torn cartilage when she fell on it." The doctor also noted that McGuire had two ankle surgeries on February 26, 1999 and May 17, 1999. The doctor also noted that McGuire had "swelling throughout the right lower leg" and right ankle, along with a scars on her lateral and anterior right ankle. At this time, McGuire presented with "increased right ankle pain, decreased range of motion, decreased strength, [and] decreased function." Def. Ex. O, part 2, pp. 19-20 (Report of J. Gibson, Physical Therapy).

• McGuire again complained of right knee pain in January 2000. Specifically, McGuire told her doctor that "[s]he has pain [in her right knee] with walking, bending and stair climbing" and that had difficulty flexing her knee. As a result, McGuire complained that "she cannot do her housework as effectively and she takes frequent rests with walking and standing." An x-ray was taken and the following was found: "minimal degenerative change of the medial compartment and suggestion of possible osteochondral injury with secondary osteoarthritic degenerative change within the patella." At that time, the doctor noted "mild osteophyte formation medially of the right knee as compared to an essentially negative examination of the left knee" and "osteophytes . . . on both patellas." The doctor also wrote that McGuire had a "diminished active range of motion" and noted that McGuire's "essential problem at this point is her lack of range of motion." McGuire also advised her doctor that she previously had "a right knee injury in which she tore cartilage and ligaments" about four or five years back. Def. Ex. O, part 3, pp. 16-22 (Reports of Dr. M. Diamond, Dr. J. Craig, P. Collier, Physical Therapy, J. Gibson, Physical Therapy).

• McGuire complained of left heel pain in August 2000. Def. Ex. O, part 3, p. 28 (Report of Dr. N. Khan).

• During a February 7, 2005, office visit to Dr. Khan, McGuire again complained of pain in her right knee following a fall in December 2004. Def. Ex. F, p. 1 (Report of Dr. N. Khan).

• In January 2006, a year and a half before the collision, McGuire participated in a weight management orientation session. Notes from the orientation reveal that McGuire "is

Not Very Active during leisure time. She reports performing NO planned exercise. She reports NO participation in leisure time activities." McGuire also reported that she has pain in her knees, back, and ankle. Def. Ex. R (Report entitled "Weight Management Program Orientation – Mrs. Phyllis H McGuire").

**H.**

The Court notes that McGuire testified under oath during her deposition, *inter alia*, that she had no pre-collision right knee problems when the evidence before the Court contains multiple medical records clearly establishing, *inter alia*, significant pre-existing right knee injuries for many years, and relatively close to the time of the accident. The Court is well aware of this and has concerns relating to this testimony.

During discovery, Defendants requested that McGuire produce "[a]ll medical records generated prior to the subject accident which relate to any area of [her] injuries as alleged in the Complaint." Request for Production No. 5, Def. Ex. G. McGuire responded: "None that I am aware of or recall." *Id.*

**I.**

McGuire filed her Complaint on June 25, 2008. The Complaint contains five counts:

    Count I - Negligence (against Matijevic)
    Count II - Michigan No-Fault
    Count III - Loss of Consortium
    Count IV - Respondeat Superior
    Count V - Negligence (against AFTIM)

Counts I, II, and V are brought by Mrs. McGuire only. Count III is brought by Oscar McGuire only. Count IV is brought by Mrs. McGuire and Oscar McGuire.

On January 27, 2010, Defendants filed a Motion for Summary Judgment. Defendants argue that even assuming that the injuries claimed by McGuire were caused by the accident, they do not constitute a "serious impairment of a body function" under Mich. Comp. Laws § 500.3135(1),

precluding recovery under Michigan's no-fault laws.[3]

In their supplemental brief, filed after the Court admitted the newly-acquired pre-collision medical records of McGuire, discussed in detail above, Defendants argue that McGuire's pre- and post-collision lifestyles are similar such that McGuire cannot show that the collision affected her "general ability to lead . . . her normal life."  *See Kreiner v. Fischer*, 471 Mich. 109, 132 (2004).

In her responsive supplemental brief, McGuire argues that her current medical condition is not the result of pre-collision injuries, but rather is the result of the collision at issue in this case.

The Court notes that on July 31, 2010, the Michigan Supreme Court, in *McCormick v. Carrier*, No. 136738, ___ Mich. ___ (2010), overruled *Kreiner*'s restrictive interpretation of the term "serious impairment of a body function."  Thus, going forward on this issue, this Court and the parties will be governed by *McCormick*.

---

[3] Defendants also argue that McGuire has failed to properly disclose her expert witnesses in accordance with Fed. R. Civ. P. 26(a)(2), precluding her from relying on the statements of her treating physicians regarding impairment, causation, and prognosis at trial.  McGuire, on the other hand, asserts that she properly designated her treating physicians when she made her initial disclosures on March 17, 2009.  *See* docket entry 21.

Fed. R. Civ. P. 26(a)(2) provides, in pertinent part:

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony.

Treating physicians can testify, but not as experts unless specifically designated as experts.  The Court will address this issue, if it is raised by Defendants in a motion *in limine*.

### III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing

that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV. ANALYSIS

By statute in Michigan, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). McGuire concedes that she has not suffered "permanent serious disfigurement." Rather, she contends that she has suffered a "serious impairment of a body function." A "serious impairment of body function" is defined as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(7).

The parties' arguments in the present case focus on whether the course of McGuire's normal life has been affected by the collision. Defendants argue that McGuire cannot meet her burden of proving that her normal life has been affected by her injuries. McGuire disagrees and argues the opposite.

This inquiry must proceed on a case-by-case basis because the statute requires inherently

17

fact-specific and circumstantial determinations.

The Court finds, at this stage of the proceedings where the Court must consider the evidence in the light most favorable to the McGuires, the non-moving parties, that based on Mrs. McGuire's evidence, she has set forth facts supporting a claim that her post-accident lifestyle has been impacted with regard to her general ability to conduct the course of her life.

McGuire testified as follows regarding the post-accident changes to her lifestyle: (1) she can no longer do housework, whereas before the accident she could; (2) she can no longer bowl (although she has not tried), whereas before the accident she bowled about once every month; (3) she can no longer sew, whereas before the accident she sewed once every month or every other month; (4) she can no longer go dancing, whereas before the accident she would go dancing once or twice per month; (5) she can no longer play with her grandchild in the same way as she could before the accident; and (6) she can no longer attend out-of-town family reunions. According to McGuire, the accident did not affect her ability to read.

Before the accident, McGuire testified that she bowled, sewed, danced, and participated in family reunions on an infrequent basis. Thus, her purported inability to participate in these four activities after the accident does not affect her general ability to conduct the course of her normal life. Defendants assert that "[m]ost of [McGuire's] alleged inabilities post-accident are not 'serious impairments' but mere hobbies in which she rarely engaged in prior to the accident, and some of which she hasn't even tried to engage in since the accident." Reply at 3.

As discussed extensively in Section II(G) above, McGuire has an extensive history of pre-collision medical issues, including right knee and back problems, among other problems, dating back to 1992 and continuing through 2006. She complained of right lower extremity pain in 1992.

She fell from a stepladder in 1995 and landed on her right knee, causing extensive right knee and ankle injuries. The pain from this accident continued into 1996. In 1998, McGuire strained her right lower leg. In 1999, she fell rollerskating, requiring ankle surgery. In June 2000, McGuire complained of right knee pain when walking, bending, and stair climbing. An examination and x-rays revealed extensive medical issues with her right knee at that time. In February 2000, McGuire complained to her doctor that "because of [right knee] pain, she [could not] do her housework as effectively." McGuire again complained of right knee pain on February 2005, after a fall. Moreover, a year before the collision, in January 2006, McGuire complained during her weight management program orientation of knee, back, and ankle pain. She also reported at that time that she "is Not Very Active during leisure time" and reported "NO participation in leisure time activities."

In sum, taking the evidence in the light most favorable to the non-moving party, while a comparison of McGuire's pre-collision medical records with many of her post-collision medical records reveals little post-collision change in condition or lifestyle, this is sufficient to proceed to trial.

Further, McGuire is also asserting post-accident closed-head injuries. There is no pre-existing history of this medical claim.

McGuire accuses Defendants of advancing the argument she is precluded from recovering because she is elderly and obese. This is an inflammatory mischaracterization of Defendants' argument. What Defendants are saying, and the Court agrees, is that McGuire's obesity is relevant to the extent that it limited her physical abilities before and after the collision. Indeed, McGuire sought medical treatment for her weight condition at HFHS as recently as 2006.

## V. POST-ARGUMENT SUPPLEMENTAL BRIEFING

The Court notes, specifically, the post-oral argument supplemental briefing applying the HFHS medical records to the parties' positions.

Defendants start out by pointing the Court to exhibits which they claim show that "Plaintiff's Pre-Accident Medical Records Document A Long History of Neck, Back, and Lower and Upper Extremities Injuries and Pain with Substantial Physical Limitations."

These exhibits, Defendants contend, confirm factually a more than 20-year history of complaints of pain, physical impairment, physical limitations, and medical treatments prior to the subject accident.

McGuire's last HFHS medical record prior to the subject accident, which related to a weight management program because her weight was 307 lbs, states on January 26, 2006:

> She reports performing no planned exercise. She reports no participation in leisure time activities.

Def. Ex. R, p. 2.

That same HFHS exhibit states on page 2 that Plaintiff reported a pervious hospital stay in 1999 for a broken ankle, and:

> The patient reports the following symptoms:
>
> > Pain in knees
> > Pain in back
> > Pain in ankle

These issues will be dealt with at trial.

In *McCormick*, the Michigan Supreme Court held: "If there is a material factual dispute regarding the nature and extent of the person's injuries, the court should not decide the issue as a matter of law." Slip op. at p. 11.

# VI. CONCLUSION

The Court concludes that while there is significant medical record evidence of multiple pre- and post-accident continuing injuries including pain in knees, back and ankle, and similar evidence of no pre-accident exercise and little participation in leisure time activities, at this stage of the proceedings, including Plaintiffs' deposition testimony denying preexisting medical conditions, albeit contradicted in large part by medical records testimony, but also alleged closed-head injuries, taking the evidence in the light most favorable to the Plaintiffs as the non-moving party, the Court denies Defendants' Motion for Summary Judgment.

SO ORDERED.


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: August 6, 2010


## CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 6, 2010.

S/Denise Goodine
Case Manager